**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

MCLEODUSA
TELECOMMUNICATIONS
SERVICES, INC.,

        Plaintiff,

vs.

QWEST CORPORATION and
QWEST COMMUNICATIONS
CORPORATION,

        Defendants.

No. C 06-0035-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION TO DISMISS CERTAIN
COUNTERCLAIMS**

_____

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.* **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B.* **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       *1.* **The Complaint and Counterclaims** . . . . . . . . . . . . . . . . . . . 5
       *2.* **The Counterclaims at issue** . . . . . . . . . . . . . . . . . . . . . . . . 5
           *a.* **Negligent misrepresentation** . . . . . . . . . . . . . . . . . . 6
           *b.* **Conversion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
           *c.* **Trespass** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           *d.* **Fraud** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
           *e.* **Fraudulent concealment** . . . . . . . . . . . . . . . . . . . . 11
           *f.* **Negligence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
       *3.* **The motions to dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . 14

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   *A.* **Standards For A Rule 12(b)(6) Motion To Dismiss** . . . . . . . . . . . . . 17
   *B.* **The Sufficiency Of Qwest's "Tort" Allegations** . . . . . . . . . . . . . 20

        **1.**      *The negligent misrepresentation counterclaims* . . . . . . . . . . 21
              **a.**      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 21
              **b.**      *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . 23
              **c.**      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        **2.**      *The conversion counterclaims* . . . . . . . . . . . . . . . . . . . . 37
              **a.**      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 37
              **b.**      *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . 38
              **c.**      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
        **3.**      *The trespass counterclaims* . . . . . . . . . . . . . . . . . . . . . 43
              **a.**      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 43
              **b.**      *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . 44
              **c.**      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        **4.**      *The fraud counterclaim* . . . . . . . . . . . . . . . . . . . . . . . 48
              **a.**      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 48
              **b.**      *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . 49
              **c.**      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        **5.**      *The fraudulent concealment counterclaims* . . . . . . . . . . . . 51
              **a.**      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 51
              **b.**      *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . 52
              **c.**      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
        **6.**      *The negligence counterclaims* . . . . . . . . . . . . . . . . . . . . 55
              **a.**      *Arguments of the parties* . . . . . . . . . . . . . . . . . . . 55
              **b.**      *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . 56
              **c.**      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

***III. CONCLUSION*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

D isputes between telecommunications companies, which provide each other with various services for initiation or completion of intrastate, interstate, wireless, wire-line, long-distance, and "toll free" (8XX) calls to and from each other's customers, have ripened into litigation. The plaintiff asserts six claims of breach of

contract, one claim of quantum meruit, one claim of unjust enrichment, and one claim for declaratory judgment that the plaintiff does not owe the defendants the amounts that the defendants have claimed for terminating access charges. In response, the defendants assert thirty-nine counterclaims, among them fourteen "tort" counterclaims that the plaintiff now challenges in a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims upon which relief can be granted. The challenged counterclaims are for negligent misrepresentation, conversion, trespass, fraud, fraudulent concealment, and negligence. The court must decide whether the defendants' challenged counterclaims are merely restated contract claims, as the plaintiff contends, or claims with an independent basis that can properly be asserted along side of the defendants' contract claims, as the defendants contend.

## I. INTRODUCTION

### A. Factual Background

As explained more fully below, in considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged by the complaining party, here the counterclaimants, are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Therefore, for purposes of the plaintiff's Rule 12(b)(6) motion to dismiss some of the defendants' counterclaims, the factual background that is relevant is set forth in the defendants' counterclaim.

Defendants Qwest Corporation and Qwest Communications Corporation (collectively, "Qwest"), allege, generally, that plaintiff McLeodUSA has deliberately and systematically attempted to lower its operating costs and to generate revenue by violating obligations under law or contract, including obligations to Qwest. Qwest is a telecommunications carrier providing both local telephone services in fourteen states,

including Iowa, and long-distance telephone services throughout most of the country. At a more technical level, as a local telephone service provider, Qwest is a "local exchange carrier" or "LEC," and as a long-distance services provider, Qwest is an "interexchange carrier" or "IXC." McLeodUSA is also a "LEC," but more specifically, is a "competitive local exchange carrier" or "CLEC," and is also an IXC. Other entities are "ILECs," or "incumbent local exchange carriers." Non-party Iowa Network Services ("INS") is a consortium of Iowa ILECs established years ago as an entity to provide the ILECs' customers with an alternative for long-distance service to the then-prevailing long-distance carrier (AT&T). Today, Qwest alleges that INS continues to provide to many Iowa ILECs (but not Qwest or McLeod) long-distance services as well as other services, such as data processing and billing functions.

The various entities, including Qwest, McLeodUSA, and various LECs, must regularly exchange telephone calls between each other's customers in order to create seamless and ubiquitous telephone service throughout Iowa. Thus, Qwest and McLeodUSA are parties to various Interconnection Agreements ("ICAs"), which govern, among other things, the terms and conditions under which the parties agree to exchange local telephone calls between their respective networks. Qwest alleges that these ICAs govern, in part, the use of Local Interconnection Service facilities between Qwest and McLeod, but Qwest alleges that the ICAs do not authorize McLeod to use Qwest's Local

Interconnection Service facilities to route most kinds of toll calls, such as interLATA calls,[1] 8XX calls,[2] or other toll calls carried by IXCs. The parties' disputes and, more specifically, the counterclaims at issue here, arise from allegations of unauthorized use of the parties' facilities and non-payment of the charges, or "tariffs," for routing of local and long-distance calls through and between the parties' systems.

## B. Procedural Background

### 1. The Complaint and Counterclaims

In a Complaint (docket no. 1), filed March 14, 2006, McLeodUSA asserts six claims of breach of contract, one claim of quantum meruit, one count of unjust enrichment, and one count for declaratory judgment that it does not owe Qwest the amounts that Qwest has claimed for terminating access charges. Qwest filed an Answer and Counterclaims (docket no. 21) on May 19, 2006, and its First Amended Counterclaims (docket no. 41) on August 24, 2006, the latter of which asserts thirty-nine counterclaims.

### 2. The Counterclaims at issue

For present purposes, the counterclaims at issue are the "tort" counterclaims asserted by Qwest in Counts VI, VII, VIII, XVII, XVIII, XIX, XXII, XXV, XXVI, XXVIII, XXIX, XXX, XXXIII, and XXXIV of its Counterclaims. These Counts assert

---

[1] A LATA is an industry-defined, specific geographic area. Thus, "interLATA calls" are calls in which the caller and the called party are in different LATAs, while "intraLATA calls" are calls in which the caller and the called party are in the same LATA, but the called party is not within the caller's local service area.

[2] "8XX calls" are specific kinds of toll calls in which the call is placed to a phone number starting with toll-free area codes such as 800, 888, 877, 866 or 855. 8XX calls are always classified as toll calls and not local calls, even if the called party is in the same local service area as the caller.

claims of negligent misrepresentation, conversion, trespass, fraud, fraudulent concealment, and negligence. The court will identify briefly, in turn, the allegations supporting each kind of counterclaim.

### a. *Negligent misrepresentation*

Qwest asserts three counterclaims for "negligent misrepresentation": Count VI (regarding Qwest's 8XX access charge), Count XIX (regarding interLATA access charges), and Count XXIX (regarding INS terminating access charges). More specifically, in Count VI, Qwest alleges, in part, the following:

> 166. As part of its business, McLeod is engaged in providing 8XX services. In the course of, and as a necessary and critical part, McLeod's business requires McLeod to provide information to a third-party SMS 800 Database. Qwest and other carriers, including McLeod, rely on the information submitted to the SMS 800 Database. This information is necessary for Qwest and other carriers to properly route the calls to their destinations, which includes forwarding the information to third parties. In addition, the information McLeod provides is required to enable accurate billing of the carriers of services. As with the proper routing of calls, the information in the SMS 800 Database is forwarded on to third parties for billing purposes. As a result, McLeod has a pecuniary interest in submitting information to the SMS 800 Database.

Qwest's First Amended Counterclaims (Counterclaims) (docket no. 41), ¶ 166. Qwest alleges, further, that Qwest and other carriers rely on the information provided by McLeodUSA; that McLeodUSA supplied false information that caused Qwest not to collect access charges and falsely represented that it had authorization to use Qwest's proprietary facilities in connection with McLeodUSA's 8XX numbers; that McLeodUSA intended to supply this false information and knew or should have known that the information was

false; that Qwest reasonably and justifiably relied on the false information provided by McLeodUSA, with the result that McLeodUSA avoided charges from Qwest for use of Qwest's services; and that Qwest's reliance on the false information was the proximate cause of injury and loss to Qwest. *Id.* at ¶¶ 167-74. Qwest alleges, further, that McLeodUSA acted willfully, wantonly, and maliciously, and that such conduct was specifically directed towards Qwest, warranting an award of punitive and exemplary damages. *Id.* at ¶ 175. In Counts XIX and XXIX of its Counterclaims, Qwest makes similar allegations that McLeodUSA provided false information to Qwest relating to its interLATA access and INS terminating access, respectively. *See id.* Count XIX, ¶¶ 260-69; Count XXIX, ¶¶ 340-47.

### b. Conversion

Qwest asserts three counterclaims for "conversion": Count VII (regarding Qwest's 8XX access charges), Count XXV (regarding interLATA access charges), and Count XXXIII (regarding INS terminating access charges). More specifically, in Count VII, Qwest alleges, in part, the following:

> 177. Qwest has a property right in its proprietary network, which includes buildings, equipment, wires, and computers. Qwest also has property rights in the extensive resources it owns, including employees and tangible items, that are necessary to service, repair, operate, maintain and upgrade its network.
>
> 178. McLeod intentionally and wrongfully interfered with Qwest's property by using Qwest's network without authorization. McLeod had no authorization to place codes in the third-party SMS 800 Database that directly caused 8XX calls to McLeod and McLeod's customers to be routed over Qwest's local network, for which Qwest received no compensation.

> 179. McLeod's interference with Qwest's property was
> serious and continued over a long time period. McLeod's
> assertion of a right to use Qwest's network without express
> authorization under law or under the parties' ICAs is
> inconsistent with Qwest's right to control the uses of its
> network. McLeod did not act in good faith.
>
> 180. Qwest has been harmed because it lost revenue
> it would have obtained, had McLeod routed its traffic in the
> manners that Qwest had authorized McLeod. Finally,
> McLeod's unauthorized use of Qwest's network has caused
> Qwest to suffer inconvenience and to incur expenses.

Counterclaims, Count VII, ¶¶ 177-80. Qwest alleges, further, that McLeodUSA must pay

the full value for its wrongful use of Qwest's property; must pay Qwest for its costs and

damages caused by McLeodUSA's wrongful use of Qwest's property, including but not

limited to Qwest's costs of detecting and measuring McLeodUSA's wrongful use of

Qwest's property; and, finally, that McLeodUSA acted willfully, wantonly, and

maliciously, and that such conduct was specifically directed towards Qwest, warranting an

award of punitive and exemplary damages. *Id.* at ¶¶ 181-84. In Counts XXV and

XXXIII, Qwest makes similar allegations of conversion regarding interLATA access

charges and INS terminating access charges, respectively. *See id.* at Count XXV, ¶¶ 306-

14; Count XXXIII, ¶¶ 368-75.

### c.  *Trespass*

Qwest asserts three counterclaims for "trespass": Count VIII (regarding Qwest's

8XX access charges), Count XXVI (regarding InterLATA access charges) and Count

XXXIV (regarding INS terminating access charges). More specifically, in Count VIII,

Qwest alleges, in part, the following:

> 187. Qwest has a property right in its proprietary
> network, which includes buildings, equipment, wires, and
> computers. Qwest also has property rights in the extensive

resources it owns, including employees and tangible items, that are necessary to service, repair, operate, maintain and upgrade its network.

> 188.  McLeod has trespassed on Qwest's network by using, without authorization, Qwest's network to route McLeod's 8XX calls.

Counterclaims, Count VIII, ¶¶ 187-88.  Qwest alleges, further, that McLeodUSA's trespass is the proximate cause of damage to Qwest; that McLeod is liable for damages for such trespass; and, finally, that McLeodUSA acted willfully, wantonly, and maliciously, and that such conduct was specifically directed towards Qwest, warranting an award of punitive and exemplary damages.  *Id.* at ¶¶ 189-91.  In Counts XXVI and XXXIV, Qwest makes similar allegations of trespass regarding interLATA access charges and INS terminating access charges, respectively.  *See id.* at Count XXVI, ¶¶ 317-21; Count XXXIV, ¶¶ 378-82.

### d.    Fraud

Qwest asserts one counterclaim for fraud:  Count XVII (regarding interLATA access charges).  More specifically, in that Count, Qwest alleges, in part, the following:

> 241. McLeod made material representations to Qwest when terminating interLATA calls to Qwest over Local Interconnection Service facilities.  These representations consisted of data purportedly showing the originating jurisdiction of those calls identifiable by the calling number McLeod passed to Qwest with each call.

> 242.  These material statements were false.  McLeod replaced the actual calling number with a different calling number in the industry-standard signaling protocol ("SS7") that McLeod used when routing the calls to Qwest.  The false, new calling number was always in the same local service area as the called number.  This created the false impression that the call was a local call when in fact it was a long-distance interLATA call.

243. The specific instances of these false representations that Qwest has detected are too numerous and detailed to delineate. Specifically, Qwest avers that McLeod changed the CPN ("Calling Party Number") parameter in SS7 by filling this parameter with local phone numbers, usually the number of the ChPN ("Charge Party Number") or the PRI ("Primary Rate Interface").

244. McLeod knew that the representations were false and/or McLeod acted with reckless disregard for the truth.

245. McLeod intended to deceive Qwest by these false material representations. McLeod intended to induce Qwest into believing the calls were only local calls so that Qwest would charge McLeod either (depending on the particular ICA) nothing at all or, at most, only a relatively tiny charge applicable to termination of local calls. McLeod intended that Qwest would not charge McLeod the relatively larger access charge required for termination of an interLATA call.

Counterclaims, Count XVII, ¶¶ 241-45. Qwest alleges, further, that it justifiably relied on McLeodUSA's representations, in that Qwest's automated systems relied on the industry-standard SS7 signaling protocol; that it was extremely difficult and costly for Qwest to identify the fraud and that, in real time, it is impossible to detect this kind of fraud every time that it happens; that McLeodUSA's false representations proximately caused damage to Qwest by causing Qwest to collect either no charge or a relatively small charge from McLeodUSA for terminating the calls fraudulently represented by McLeodUSA; that McLeodUSA is liable for damages; and, finally, that McLeodUSA acted willfully, wantonly, and maliciously, and that such conduct was specifically directed towards Qwest, warranting an award of punitive and exemplary damages. *Id.* at ¶¶ 246-251.

### e. *Fraudulent concealment*

The penultimate set of "tort" counterclaims presently of interest are Qwest's "fraudulent concealment" counterclaims in Count XVIII (regarding interLATA access charges) and Count XXVIII (regarding INS terminating access charges). More specifically, in Count XVIII, Qwest alleges, in part, the following:

> 254. Numerous sources of law independent of contract impose a duty on McLeod to accurately disclose the nature of the call traffic it routes to Qwest. Federal and state communications laws require seamless interoperability of phone networks so that any caller can reach any called party. Under ubiquitous and extensive regulatory mandates independent of any contract, Qwest and McLeod are forced to exchange call traffic. Federal and state communications law[s] also prohibit McLeod from disguising toll traffic as local traffic. In addition, because McLeod solely controls the information related to the calls it sends to Qwest, Qwest has a relationship of trust with McLeod requiring McLeod to accurately identify the nature of its calls. McLeod's sole control of information about its call traffic also creates an inequality of knowledge between McLeod and Qwest with respect to the nature of these calls.
>
> 255. Based on these sources of law, McLeod had legal duties (i) not to change the call data with interLATA calls in such a way as to disguise the fact that the call was interLATA, and (ii) not to change the call data so as to make interLATA calls appear to be local calls.
>
> 256. McLeod purposely suppressed the truth with respect to these material facts in the course of McLeod's transaction with Qwest.

Counterclaims, Count XVIII, ¶¶ 254-56. Qwest alleges, further, that McLeodUSA's fraudulent concealment proximately caused damage to Qwest; that McLeodUSA is liable for the injury and loss that it has caused; and, finally, that McLeodUSA acted willfully,

wantonly, and maliciously, and that such conduct was specifically directed towards Qwest, warranting an award of punitive and exemplary damages. *Id.* at ¶¶ 257-59.

In Count XXVIII, Qwest makes sufficiently different allegations of "fraudulent concealment" regarding INS terminating access charges to warrant statement of those allegations here. After alleging, again, that sources of law independent of contract impose a duty on McLeodUSA to accurately disclose the nature of the call traffic that it routes to Qwest, Qwest alleges the following:

> 334. Based on these sources of law, McLeod had a legal duty to identify itself to Qwest and to INS and the Iowa ILECs, and other states' ILECs, that McLeod originated calls terminated through Qwest to INS and the ILECs, so that INS and the ILECs could properly bill McLeod terminating access charges for these calls.
>
> 335. McLeod breached these legal duties by intentionally and/or recklessly failing to place in the data with each call the industry-standard codes that would identify McLeod as the carrier originating the calls. By not including these data in the calls, McLeod knew or should have known that downstream carriers like Qwest, INS and the ILECs generally would be unable or unlikely to identify McLeod as the source of the call traffic. This concealment of McLeod's origination of the calls thereby permitted McLeod to avoid being billed for terminating access charges for these calls.
>
> 336. McLeod's concealment of its origination of these calls successfully deceived INS and the ILECs into believing that Qwest, not McLeod, originated the calls. INS and the ILECs therefore billed Qwest for terminating access charges for these calls, instead of McLeod.

Counterclaims, Count XXVIII, ¶¶ 334-36. Qwest then alleges that it was injured by McLeodUSA's fraudulent concealment, because it paid INSs and the ILECs access charges for McLeodUSA's traffic; that McLeodUSA is liable for the injury and loss that it has

caused; and, finally, that McLeodUSA acted willfully, wantonly, and maliciously, and that such conduct was specifically directed towards Qwest, warranting an award of punitive and exemplary damages. *Id.* at ¶¶ 337-39.

### f.    *Negligence*

The last set of counterclaims presently of interest are Qwest's "negligence" counterclaims in Count XXII (regarding interLATA access charges) and Count XXX (regarding INS terminating access charges).   More specifically, in Count XXII, Qwest alleges, in part, the following:

> 285.   Federal and state laws require the seamless integration of telecommunication services.  These requirements are imposed on all carriers, like McLeod.   Due to these requirements, carriers must provide information regarding calls so that these calls may be routed properly to their destination.
> 286.   State laws prohibit McLeod from placing toll traffic on Local Interconnection Service facilities between McLeod and Qwest.
> 287.   McLeod's routing of toll calls to Qwest through Local Interconnection Service facilities between McLeod and Qwest violates state laws.
> 288.   McLeod's violation of these state laws is evidence of McLeod's negligence.
> 289.   McLeod owed a duty to Qwest not to violate state laws by placing toll traffic on the Local Interconnection Service facilities between McLeod and Qwest.
> 290.   McLeod's breach of its duties to Qwest proximately caused injury to Qwest, because Qwest was not able to collect access charges for toll traffic.
> 291.   McLeod is liable to Qwest for its negligent violation of state laws, in an amount to be determined at trial.

Counterclaims, Count XXII, ¶¶ 285-91.

13

In Count XXX, in addition to allegations concerning the duty on which the claim is based that are comparable to those found in ¶ 285, quoted above, Qwest alleges the following:

> 350.    Under Iowa law, McLeod had a legal duty to pay INS's and the Iowa ILECs' tariffed access charges for calls that McLeod originated and transited through Qwest's network to INS's and the Iowa ILECs' networks.
> 351.    McLeod owed this duty not just to INS and the Iowa ILECs but also to Qwest, whose network McLeod intentionally used to transit the calls to INS and the Iowa ILECs.

Counterclaims, Count XXX, ¶¶ 350-51.   Qwest alleges, further, that McLeodUSA breached these duties by refusing to identify itself to INS and the Iowa ILECs as being responsible for paying the access charges and by failing to actually pay the access charges; that McLeodUSA's breach of its duties is evidence of negligence; that Qwest has been damaged by McLeodUSA's negligence, because Qwest was unaware of and/or unable at the time to identify the charges that McLeodUSA was legally responsible to pay; and that McLeodUSA is liable to Qwest for damages.  *Id.* at ¶¶ 352-55.

### 3.    *The motions to dismiss*

On July 24, 2006, instead of filing a Reply to Qwest's Counterclaims, McLeodUSA filed a Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted (docket no. 29), challenging the fifteen "tort" counterclaims asserted in Qwest's original Answer and Counterclaims.  On August 24, 2006, Qwest filed its First Amended Counterclaims (docket no. 41), in which it asserted thirty-nine counterclaims, including the fourteen "tort" counterclaims for negligent misrepresentation, conversion, trespass, fraudulent concealment, fraud, and negligence, that are described above.  Also on August 24, 2006, Qwest filed a Brief In Opposition To Plaintiff's Motion To Dismiss For Failure

To State A Claim Upon Which Relief May Be Granted (docket no. 42), in which Qwest argued that McLeodUSA's motion to dismiss was "mooted" by the concurrent filing of Qwest's First Amended Counterclaims. McLeodUSA did not respond to Qwest's contention that McLeodUSA's motion to dismiss the "tort" counterclaims in Qwest's original Counterclaims was "mooted" by the filing of Qwest's First Amended Counterclaims. Under these circumstances, the court agrees that McLeodUSA's July 24, 2006, Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted (docket no. 29), which pertains to Qwest's original Counterclaims (docket no. 21), filed May 19, 2006, is moot.

On September 11, 2006, McLeodUSA filed an amended Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted (docket no. 44), challenging the fourteen "tort" counterclaims that Qwest had chosen to replead in its First Amended Counterclaims. In essence, McLeodUSA contends that Qwest's "tort" counterclaims are not based on any duty independent of the parties' contracts and that Qwest's negligent misrepresentation counterclaims also fail, because Qwest does not allege that McLeodUSA is in the business or profession of supplying information to others. McLeod argues that a federal court in North Carolina dismissed Qwest's nearly identical counterclaims for the reasons it now states before McLeodUSA's motion to dismiss the counterclaims in this case was filed. McLeodUSA urges this court to dismiss Qwest's "tort" counterclaims for the reasons stated by the court in North Carolina.

In a Resistance (docket no. 49), filed October 5, 2006, Qwest argues that McLeodUSA's argument for dismissal of the "tort" counterclaims is fatally superficial, because many of Qwest's torts—specifically, its conversion, trespass, and fraud counterclaims—do not require proof of any independent "duty" at all, so that those counterclaims can co-exist with Qwest's contract-based counterclaims. Qwest asserts,

15

further, that fraudulent concealment claims can arise from breach of a duty of honesty in a contractual relationship, and that its fraudulent concealment claims are based on breach of such a duty. Finally, as to its negligent misrepresentation counterclaims, Qwest argues that its factual allegations demonstrate that the information that McLeodUSA supplies is not incidental to its business, but is the very purpose of its business. Qwest also asserts that this court should not rely on the unreported decision of the federal court in North Carolina on which McLeodUSA asks this court to rely, because the torts at issue here are not the same as the ones asserted in the litigation in North Carolina, Iowa law, not North Carolina law, applies to the counterclaims asserted here, and the factual allegations supporting the claims in the two cases are not the same.

On October 16, 2006, McLeodUSA filed a Reply (docket no. 51) in further support of its motion to dismiss. In its Reply, McLeodUSA contends that Qwest has missed the point by arguing that a conversion claim *can* co-exist with contract claims, on the ground that a conversion claim does not include a "duty" element, because the essence of McLeodUSA's challenge is that Qwest's actual conversion claims *are* just contract claims dressed up in different semantic garb, where the rights that Qwest alleges that McLeodUSA violated are Qwest's contractual rights. McLeodUSA also argues that Iowa law does not recognize Qwest's claim for trespass to a telecommunications network and that Qwest has not alleged any duty independent of contract upon which to base its fraudulent concealment and negligence counterclaims. Finally, McLeodUSA reiterates its contention that Qwest's negligent misrepresentation claims fail, because Qwest simply cannot show that McLeodUSA is in the business or profession of supplying information.

The court will address below, in more detail, these and other claim-specific arguments in its analysis of McLeodUSA's motion to dismiss Qwest's "tort" counterclaims.

## II. LEGAL ANALYSIS

### A. Standards For A Rule 12(b)(6) Motion To Dismiss

The issue on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence in support of his, her, or its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1376 (8th Cir. 1989). In considering a motion to dismiss under Rule 12(b)(6), the court must assume that all facts alleged by the complaining party, here the Qwest, are true, and must liberally construe those allegations. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Gross v. Weber*, 186 F.3d 1089, 1090 (8th Cir. 1999) ("On a motion to dismiss, we review the district court's decision de novo, accepting all the factual allegations of the complaint as true and construing them in the light most favorable to [the non-movant]."); *St. Croix Waterway Ass'n v. Meyer*, 178 F.3d 515, 519 (8th Cir. 1999) ("We take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff."); *Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999) (same); *Midwestern Machinery, Inc. v. Northwest Airlines*, 167 F.3d 439, 441 (8th Cir. 1999) (same); *Wisdom v. First Midwest Bank*, 167 F.3d 402, 405 (8th Cir. 1999) (same); *Duffy v. Landberg*, 133 F.3d 1120, 1122 (8th Cir.) (same), *cert. denied*, 525 U.S. 821 (1998); *Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1303-04 (8th Cir. 1997) (same); *WMX Techs., Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1198 (8th Cir. 1997) (same); *First Commercial Trust v. Colt's Mfg. Co.*, 77 F.3d 1081, 1083 (8th Cir. 1996) (same).[3]

---

[3]On a motion to dismiss pursuant to Rule 12(b)(6), the court ordinarily cannot consider matters outside of the pleadings, unless the court converts the Rule 12(b)(6)

(continued…)

The court is mindful that, in treating the factual allegations of a complaint (or counterclaim) as true pursuant to Rule 12(b)(6), the court must "reject conclusory

[3](...continued)
motion into a motion for summary judgment pursuant to Rule 56. *See* FED. R. CIV. P. 12(b)(6); *see also Buck*, 75 F.3d at 1288 & n. 3. Rule 12(b) provides in part as follows:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

FED. R. CIV. P. 12(b); *see also Buck v. F.D.I.C.*, 75 F.3d 1285, 1288 & n. 3 (8th Cir. 1996). Although Rule 12(b) generally prohibits consideration of matters outside of the pleadings on a motion to dismiss, the court may consider certain matters outside of the pleadings without converting the motion into a motion for summary judgment. For example, the court may consider documents outside of the pleadings where "the plaintiffs' claims are based solely on the interpretation of the documents [submitted] and the parties do not dispute the actual contents of the documents." *Jenisio v. Ozark Airlines, Inc., Retirement Plan*, 187 F.3d 970, 972 n.3 (8th Cir. 1999) (citing *Silver v. H & R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997)). Nor is a motion to dismiss automatically converted into one for summary judgment "simply because one party submits additional matters in support of or opposition to the motion," because "[s]ome materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss." *Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999), *cert. denied*, 527 U.S. 1039 (1999). Finally, even where matters outside of the pleadings are presented to the court, a motion to dismiss is not converted into a motion for summary judgment "where the district court's order makes clear that the judge ruled only on the motion to dismiss." *Skyberg v. United Food and Commercial Workers Int'l Union, AFL-CIO*, 5 F.3d 297, 302 n.2 (8th Cir. 1993). Where the district court has made the posture of its disposition clear, the appellate court will "treat the case as being in that posture." *Id.* In this case, however, the parties do not appear to rely on any matters outside of the pleadings, so that the motion will be resolved on the basis of the pleadings.

allegations of law and unwarranted inferences." *Silver*, 105 F.3d at 397 (citing *In re Syntex Corp. Securities Lit.*, 95 F.3d 922, 926 (9th Cir. 1996)); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990) (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts," citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987), and 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1357, at 595-97 (1969)); *see also LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1103 (6th Cir. 1995) (the court "need not accept as true legal conclusions or unwarranted factual inferences," quoting *Morgan*, 829 F.2d at 12). Conclusory allegations need not and will not be taken as true; rather, the court will consider whether the *facts* alleged in the defendants' Counterclaims, accepted as true, are sufficient to state a claim upon which relief can be granted. *Silver*, 105 F.3d at 397; *Westcott*, 901 F.2d at 1488.

The United States Supreme Court and the Eighth Circuit Court of Appeals have both observed that "a court should grant the motion and dismiss the action 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *accord Conley,* 355 U.S. at 45-46 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."); *Meyer*, 178 F.3d at 519 ("The question before the district court, and this court on appeal, is whether the plaintiff can prove any set of facts which would entitle the plaintiff to relief" and "[t]he complaint should be dismissed 'only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations,'" quoting *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995)); *Gordon*, 168 F.3d at 1113 ("We will not dismiss a complaint for failure

to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts that would demonstrate an entitlement to relief."); *Midwestern Machinery, Inc.*, 167 F.3d at 441 (same); *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 651 (8th Cir. 1998) (same); *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (same); *Doe*, 107 F.3d at 1304 (same); *WMX Techs., Inc.*, 105 F.3d at 1198 (same). Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a claimant's factual allegations. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Thus, "[a] motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief." *Frey*, 44 F.3d at 671 (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

The court will apply these standards to McLeodUSA's motion to dismiss Qwest's "tort" counterclaims for failure to state claims upon which relief can be granted.

## B. The Sufficiency Of Qwest's "Tort" Allegations

Although McLeodUSA's motion to dismiss Qwest's "tort" counterclaims is based, in the first instance, on a blanket allegation that those "tort" counterclaims are not based on any duty independent of the parties' contracts, the court finds that whether or not the challenged counterclaims state claims upon which relief can be granted must be analyzed at least category by category and, in some instances, claim by claim. Therefore, the court's analysis begins with McLeodUSA's challenge to Qwest's "negligent misrepresentation" counterclaims.

### 1.    The negligent misrepresentation counterclaims

As explained in more detail above, Qwest alleges "negligent misrepresentation" counterclaims in Counts VI (regarding Qwest's 8XX access charge), XIX (regarding interLATA access charges), and XXIX (regarding INS terminating access charges). The court's analysis of these claims begins with a summary of the parties' arguments concerning the sufficiency of Qwest's allegations to state "negligent misrepresentation" claims upon which relief can be granted.

### a.    Arguments of the parties

McLeodUSA makes a two-pronged attack on Qwest's "negligent misrepresentation" counterclaims: (1) its general argument that these claims, like all of the other challenged "tort" counterclaims, are not based on any duty independent from contractual duties; and (2) a claim-specific argument that Qwest has failed to plead the requirement for such claims that McLeodUSA is in the business or profession of supplying information to others.

In support of its first ground for dismissing these counterclaims, McLeodUSA argues that an action in tort for conduct in breach of a contract will only lie where there is a duty recognized by tort law between the parties. Here, McLeodUSA argues that Qwest's negligent misrepresentation claims, as alleged, stem directly from the very same acts that Qwest asserts are breaches of contracts, that is, breaches of tariff, interconnection, and other agreements. Indeed, McLeodUSA argues that even a cursory review of Qwest's negligent misrepresentation counterclaims reveals that those counterclaims are premised on failure to pay access and other charges under the tariffs, ICAs, and other agreements between the parties. Although Qwest alleges in its First Amended Counterclaims that the negligent misrepresentation counterclaims are based on duties "independent" of contractual duties, McLeodUSA argues that this allegation is a

legal conclusion that the court can ignore, particularly where Qwest's *factual* allegations demonstrate that the duties upon which the counterclaims are based, purported duties to pay various charges, arise under contracts.

As its second ground for dismissing these counterclaims, McLeodUSA argues that Iowa law is clear that a negligent misrepresentation claim can only be asserted against a party who is in the business or profession of supplying information to others, so that supplying information that is merely incidental to a business relationship does not meet the requirement. McLeodUSA argues that the requirement is met by "professional purveyors of information," such as abstractors, accountants, brokers, and attorneys, who provide information for the guidance of others, but cannot be met in an arm's-length business relationship, such as the one between McLeodUSA and Qwest. McLeodUSA also points out that Qwest has characterized McLeodUSA's business in its own pleadings as the business of providing telephone and telecommunications services, not supplying information.

In response, Qwest argues that McLeodUSA has cited only "generic authorities" for the proposition that a "tort" cannot arise from a "duty" provided by contract, but McLeodUSA has never addressed the specific "tort" counterclaims that Qwest has asserted here. Qwest does not, however, clearly identify in its resistance any "independent"—*i.e.*, non-contractual—duty upon which its "negligent misrepresentation" counterclaims are based. Instead, the focus of Qwest's resistance is McLeodUSA's second argument for dismissing these counterclaims, whether or not Qwest has sufficiently alleged that McLeodUSA is "in the business of supplying information." Qwest concedes that, in Iowa, a cause of action for negligent misrepresentation requires that the defendant be in the business of providing information, but asserts that whether or not a defendant is in that business depends on a case-by-case analysis. Qwest argues that there are no clear

guidelines for such an analysis, but that pertinent factors include the magnitude and probability of the loss that might attend use of the information provided by the defendant, if that information is incorrect, and whether the party supplying the information has a pecuniary interest in providing the information. Qwest contends that a valid claim of negligent misrepresentation arises where incorrect information causes harm in a separate transaction involving a party other than the plaintiff or the defendant. Qwest concedes that these factors have never been squarely applied to telephone companies, but argues that its allegations, nevertheless, squarely place McLeodUSA in the information business. Specifically, Qwest points to its allegations that McLeodUSA necessarily provided information to Qwest about the nature of calls it was sending to Qwest; McLeodUSA had an obvious pecuniary interest in the information, as its bills from Qwest depended on that information; and third parties depended on the accuracy of the information from McLeodUSA, so that inaccurate information caused harm to Qwest's relationships with third parties, for example, in its ability to collect charges for various kinds of calls.

In reply, McLeodUSA argues that, no matter how hard Qwest tries, it cannot show that McLeodUSA is in the business or profession of supplying information, because according to Qwest's own allegations, McLeodUSA is a telecommunications provider engaged in the business of transmitting and terminating millions of long-distance telephone calls. McLeodUSA asserts that it is not in the business of providing guidance to Qwest, but only information incidental to McLeodUSA's business of providing telecommunications services.

### b. *Applicable law*

The parties have given only passing consideration to the applicability to Qwest's negligent misrepresentation claims of McLeodUSA's general argument that Qwest has alleged no duty independent of contract upon which to base Qwest's negligent

misrepresentation counterclaims. The court concludes that Qwest's negligent misrepresentation counterclaims could co-exist with Qwest's contract counterclaims, because the tort of negligent misrepresentation is not based merely on a contractual duty, but is, instead, based on an independent duty arising from the tortfeasor's business or profession of supplying information, as explained more fully below. *See, e.g., Conveyor Company v. SunSource Tech. Servs., Inc.*, 398 F. Supp. 2d 992, 1013 (N.D. Iowa 2005) (under Iowa law, the "duty" necessary to sustain a negligent misrepresentation claim "'arises only when the information [upon which the claim is based] is provided by persons in the business or profession of supplying information to others'") (quoting *Sain v. Cedar Rapids Comm. Sch. Dist.*, 626 N.W.2d 115, 124 (Iowa 2001)). Thus, like the parties, the court will focus on McLeodUSA's claim-specific argument that Qwest's negligent misrepresentation counterclaims fail to state claims upon which relief can be granted, because Qwest has failed to, and cannot, allege that McLeodUSA was in the business or profession of supplying information to others, so that the requisite "duty" upon which these counterclaims must be based never arose.

This court recently explained the genesis and requirements of a claim of negligent misrepresentation under Iowa law as follows:

> The Iowa Supreme Court "first recognized the tort of negligently giving misinformation" in *Ryan v. Kanne,* 170 N.W.2d 395 (Iowa 1969), and since that time, has continued to find the "genesis" of the tort in Restatement (Second) of Torts § 552. *See Sain v. Cedar Rapids Comm. Sch. Dist.,* 626 N.W.2d 115, 123 (Iowa 2001). Section 552 of the Restatement provides as follows:
>
> > One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business

transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1). From this "genesis," the Iowa Supreme Court has recognized that, "[a]s with all negligence actions, an essential element of negligent misrepresentation is that the defendant must owe a duty of care to the plaintiff." *Sain,* 626 N.W.2d at 124; *accord Jensen v. Sattler,* 696 N.W.2d 582, 588 (Iowa 2005) ("Absent a special relationship giving rise to a duty of care, a plaintiff cannot establish negligent misrepresentation."). Although the Iowa Supreme Court has recognized that "the Restatement supports a broader view," that court has determined that, under Iowa law, "this duty arises only when the information is provided by persons in the business or profession of supplying information to others." *Id.*

Thus, the elements of the claim are the following: (1) the defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff. *See id.* at 127 ("[L]iability for negligent misrepresentation is limited to harm suffered by a person for whose benefit and guidance the counselor intended to supply the information or knew the recipient intended to supply it and to loss suffered through reliance upon the information in a transaction the counselor intended the information to influence. Additionally, we observe that the tort applies only to false information and does not apply to personal opinions or statements of future intent. Finally, the standard imposed is only one of reasonableness,

and the elements of proximate cause and damage must also be
shown.") (citations and footnote omitted).

*Conveyor Co.*, 398 F. Supp. 2d at 1013.

As in this case, one of the elements in dispute in *Conveyor Company* was whether the defendant was "in the business or profession of supplying information," *i.e.,* whether the defendant was under the "duty" necessary to sustain the claim. *Id.* at 1013-14. As to that element, this court, like the parties here, found two decisions particularly instructive, the decision of the Iowa Supreme Court in *Sain v. Cedar Rapids Community School District*, 626 N.W.2d 115 (Iowa 2001), and the decision of the Iowa Court of Appeals in *Greatbatch v. Metropoloitan Federal Bank*, 534 N.W.2d 115 (Iowa Ct. App. 1995):

> In *Sain*, the Iowa Supreme Court explained the
> necessary duty more fully. The court explained that, because
> the necessary duty only arises under Iowa law "when the
> information is provided by persons in the business or
> profession of supplying information to others[,] when deciding
> whether the tort of negligent misrepresentation imposes a duty
> of care in a particular case, [the court must] distinguish
> between those transactions where a defendant is in the business
> or profession of supplying information to others from those
> transactions that are arm's length and adversarial." *Sain,* 626
> N.W.2d at 124 (citing *Molo Oil Co. v. River City Ford Truck
> Sales, Inc.,* 578 N.W.2d 222, 227 (Iowa 1998); *Fry v. Mount,*
> 554 N.W.2d 263, 265-66 (Iowa 1996); *Freeman v. Ernst &
> Young,* 516 N.W.2d 835, 838 (Iowa 1994); *Haupt v. Miller,*
> 514 N.W.2d 905, 910 (Iowa 1994); *Meier v. Alfa-Laval, Inc.,*
> 454 N.W.2d 576, 581-82 (Iowa 1990)). More specifically,
>
> > We recognize th[at] [transactions where a defendant is
> > in the business or profession of supplying information
> > to others] justify the imposition of a duty of care
> > because a transaction between a person in the business
> > or profession of supplying information and a person
> > seeking information is compatible [sic] to a special

relationship. *See Meier,* 454 N.W.2d at 581; *see also* 2 Fowler V. Harper et al., *The Law of Torts* § 7.6, at 412-13 (2d ed.1986) [hereinafter Harper] ("remedy for negligent misrepresentation [is] principally against those who advise in an essentially nonadversarial capacity"). A special relationship, of course, is an important factor to support the imposition of a duty of care under a claim for negligence. *See J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.,* 589 N.W.2d 256, 259 (Iowa 1999). Moreover, a person in the profession of supplying information for the guidance of others acts in an advisory capacity and is manifestly aware of the use that the information will be put, and intends to supply it for that purpose. *See Restatement (Second) of Torts* § 552 cmt. a; *see also* Dobbs § 472, at 1350-51; 2 Harper § 7.6, at 405-06. Such a person is also in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect. *Restatement (Second) of Torts* § 552 cmt. a. Under these circumstances, the foreseeability of harm helps support the imposition of a duty of care. *See J.A.H. ex rel. R.M.H.,* 589 N.W.2d at 258 (reasonable foreseeability of harm to person who is injured is a factor in deciding whether a legal duty exists). Additionally, the pecuniary interest which a person has in a business, profession, or employment which supplies information serves as an additional basis for imposing a duty of care. *See Restatement (Second) of Torts* § 552 cmts. c, d. On the other hand, information given gratuitously or incidental to a different service imposes no such duty. *See id.; see also Meier,* 454 N.W.2d at 581-82 (defendant in business of selling and servicing merchandise, not supplying information).

*Sain,* 626 N.W.2d at 124-25 (footnote omitted).

In short, where the defendant was "not in the business or profession of supplying information to [the plaintiff]," and

the transaction was, instead, "an arms-length and adversarial transaction," the plaintiff cannot prevail on a negligent misrepresentation claim. *Jensen,* 696 N.W.2d at 588; *Sain,* 626 N.W.2d at 125 (although the tort had been recognized in the context of financial or commercial transactions, holding that "the business or commercial requirement for the tort does not actually concern the subject matter of the transaction between the plaintiff and the defendant, but requires the defendant to be in the business or profession of supplying information for the guidance of others. This is the fundamental requirement to support the imposition of a duty, which is essential for all negligence claims."); *Greatbatch v. Metropolitan Federal Bank,* 534 N.W.2d 115, 117 (Iowa App. 1995) (also recognizing that "the duty to use reasonable care in supplying information applies only to persons engaged in the business or profession of supplying information to others").

Similarly, the Iowa Court of Appeals has observed that "[n]o clear guideline exists to define whether a party is in the business of supplying information." *Greatbatch,* 534 N.W.2d at 117.

> On one hand, manufacturers and dealers of merchandise have not generally been considered to be in the business of supplying information. Their businesses involve making, selling and servicing products, and any information provided during the course of the business is incidental. Similarly, sellers of a business are not themselves in the business of supplying information. On the other hand, the duty has been readily applied to accountants and investment brokers. These professions directly involve the supply of information.

*Greatbatch,* 534 N.W.2d at 117 (citations and footnote omitted); *accord Sain,* 626 N.W.2d at 126 (when the tort was recognized in *Ryan,* 170 N.W.2d at 402, the court had "indicated the tort applies not only to accountants, but logically can be extended to other professional purveyors of information"); *Fry,* 554 N.W.2d at 266 (quoting this summary from *Greatbatch* ). In addition, the court noted that Iowa

decisions had distinguished cases where information is supplied as "part of the overall product," and the defendant was thus "in the business of supplying information," from cases in which the information was merely "incidental to the underlying ··· transaction," and the defendant, therefore, was not subject to a negligent misrepresentation claim. *Id.* at 118.

Finally, the court, not the jury, decides whether defendants were "in the business of supplying information" as a matter of law, in light of the facts, because the defendants' duty is always a matter for the court to decide. *See, e.g., Fry,* 554 N.W.2d at 265 (in a negligent misrepresentation case, the court wrote, "Whether such a duty exists is always a question of law for the court."); *Greatbatch,* 534 N.W.2d at 116 (in a negligent misrepresentation case, the court wrote, "Whether a duty exists to impose an obligation on a defendant to conform to a standard of care for the benefit of the plaintiff is an issue of law for courts to resolve").

*Conveyor Co.*, 398 F. Supp. 2d at 1014-15.

In *Conveyor Company*, Conveyor, the manufacturer of a "stinger stacker," used for unloading certain raw materials from a ship to ground stock piles, attempted to assert a negligent misrepresentation claim against SunSource, the supplier of the hydraulic lift package, after the collapse of a stinger stacker into which the hydraulic lift package had been incorporated. *Id.* at 995. This court concluded, as a matter of law, that SunSource was not under the kind of "duty" that would give rise to a negligent misrepresentation claim, because it was not in the business or profession of supplying information to others. *Id.* at 1015. This court explained that conclusion, as follows:

[C]ontrary to Conveyor's contentions, the record shows that SunSource was not "act[ing] in an advisory capacity," even if it was "manifestly aware of the use" to which the hydraulic lift package would be put, and intended to supply the hydraulic lift package for that purpose. *Id.* at 124-25. What SunSource provided was not *information* about hydraulic lift

packages or flow dividers, but a hydraulic lift package intended to meet Conveyor's specifications. SunSource was presented with certain specifications for the hydraulic lift package, and provided a product that ostensibly met those specifications; SunSource was not in the position of providing *information,* or in the position of weighing the use for the *information* against the magnitude and probability of loss that might attend the use of the information if it was incorrect. *Compare id.* at 125 (it is the defendant's provision of *information,* rather than a product, that invokes the necessary duty). Under these circumstances, SunSource's pecuniary interest in its business of selling hydraulic lift packages simply does not create the sort of duty that would sustain a negligent misrepresentation claim. *Compare id.* (pecuniary interest in the business is an additional basis for imposing a duty of care). Information about the flow divider was given "gratuitously or incidental to a different service," the provision of a hydraulic lift package meeting the contract specifications, so that service did not impose the necessary duty. *Id.* In other words, what was involved here was "an arms-length and adversarial transaction" in which SunSource quoted the price for and then provided a product meeting Conveyor's specifications. *See Jensen,* 696 N.W.2d at 588 (such a relationship will not sustain a negligent misrepresentation claim).

To put it another way, SunSource was not a "professional purveyor of information," *see id.* at 126, such as an accountant or investment broker. *Greatbatch,* 534 N.W.2d at 117. Nor can it reasonably be said that SunSource provided information about the necessary requirements for an adequate hydraulic lift package as "part of the overall product." *Id.* at 118. Rather, SunSource acted as a manufacturer or dealer of merchandise, whose business involved making and selling products, among them hydraulic lift packages, and any information SunSource provided during the course of that business was merely "incidental to the underlying ··· transaction" involving the sale of a hydraulic lift package. *Id.*

*Conveyor Co.*, 398 F. Supp. 2d at 1016 (emphasis in the original). In light of its conclusion in *Conveyor Company* that the supplier was not in the business of providing information, the court granted the supplier's motion for summary judgment on the manufacturer's negligent misrepresentation claim. *Id.*

Subsequent to this court's decision in *Conveyor Company*, the Iowa Supreme Court in *Sturm v. Peoples Trust & Savings Bank*, 713 N.W.2d 1 (Iowa 2006), rejected a negligent misrepresentation claim against a bank by defaulters on a loan based on allegations that the bank had negligently misrepresented the defaulters' rights and duties under the loan agreements thereby causing the defaulters to suffer damage. The court found that the major obstacle to applying the tort in that case was that "'the tort does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant.'" *Sturm*, 713 N.W.2d at 5 (quoting *Sain*, 626 N.W.2d at 126). The court explained that the tort "'predominately applies to situations where the information supplied harmed the plaintiff in its relations with third parties.'" *Id.* (again quoting *Sain*, 626 N.W.2d at 126). Because this requirement of harm in a third-party relationship from information supplied by the tortfeasor to the claimant was not met, the court found that the transaction upon which the negligent misrepresentation claim was based was not one in which the defendant was in the business of supplying information, but one involving parties to an arm's-length or adversary transaction, so that the tort was inapplicable. *Id.*

### c.    *Analysis*

In this case, the court finds that McLeodUSA is entitled to dismissal of Qwest's negligent misrepresentation claims for failure to state claims upon which relief can be

granted, because, like the defendant in *Conveyor Company*, McLeodUSA was not under the kind of "duty" that would support a claim of negligent misrepresentation, where McLeodUSA was simply not "'in the business or profession of supplying information to others.'" *Id.* at 1015 (quoting *Sain*, 626 N.W.2d at 124). First, to the extent that Qwest's allegations could be construed to allege that McLeodUSA was "in the business or profession of supplying information to others," such allegations would be conclusions of law, not allegations of fact. *See id.* (citing *Fry,* 554 N.W.2d at 265, as stating, in a negligent misrepresentation case, "Whether such a duty exists is always a question of law for the court," and *Greatbatch,* 534 N.W.2d at 116, as stating, in a negligent misrepresentation case, "Whether a duty exists to impose an obligation on a defendant to conform to a standard of care for the benefit of the plaintiff is an issue of law for courts to resolve"). As legal conclusions, such allegations need not be taken as true. *Silver*, 105 F.3d at 397 (pursuant to Rule 12(b)(6), the court must "reject conclusory allegations of law and unwarranted inferences"); *Westcott*, 901 F.2d at 1488 (the court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts"). Instead, the court will consider whether the *facts* alleged in Qwest's negligent misrepresentation counterclaims, accepted as true, are sufficient to establish that McLeodUSA was in the business of supplying information. *Id.*; *Westcott*, 901 F.2d at 1488.

Even accepting Qwest's factual allegations as true, Qwest simply did not plead facts establishing, or from which the court could reasonably infer, that McLeodUSA is "in the business or profession of supplying information to others." *Conveyor Co.*, 398 F. Supp. 2d at 1015 (internal citations and quotation marks omitted). In Count VI of its Counterclaims, Qwest alleges, instead, that "[a]s part of its business, McLeod is engaged in providing 8XX services." Counterclaims, ¶ 166. Although Qwest also alleges that, "[i]n the course of, and as a necessary and critical part, McLeod's business requires

McLeod to provide information to a third-party SMS 800 Database," *id.*, that allegation does no more than allege that providing information is merely "'incidental to the underlying ⋯ transaction'" involving the provision of 8XX services, which is insufficient to sustain a negligent misrepresentation claim. *Conveyor Co.*, 398 F. Supp. 2d at 1016 (quoting *Greatbatch*, 534 N.W.2d at 118). Similarly, in its other negligent misrepresentation counterclaims, Qwest identifies McLeodUSA as an entity "in the business of terminating phone calls to Qwest," and that only "as a part of that business," *i.e.*, incidentally to that business, "McLeod suppl[ies] information to Qwest about the calls," *see* Counterclaims, Count XIX, ¶ 262, and that "McLeod's business" is "providing telecommunications services, and that only "[i]n the course of, and as a necessary and critical part of McLeod's business," *i.e.*, incidentally to that business, "McLeod necessarily must supply information to Qwest and third parties, including information that would identify McLeod as the carrier that originated the calls." *Id.*, Count XXIX, ¶ 342.

To put it another way, there is no allegation reasonably suggesting that McLeodUSA is a "professional purveyor of information," *see Sain*, 626 N.W.2d at 126, such as an accountant or investment broker. *Greatbatch,* 534 N.W.2d at 117. Plainly, Qwest has not alleged that McLeodUSA was "'act[ing] in an advisory capacity,'" even if McLeodUSA was "'manifestly aware of the use'" to which the information provided with its calls would be put in determining the access fees or charges for the calls, and intended to supply the information for that purpose. *Conveyor Co.*, 398 F. Supp. 2d at 1016 (quoting *Sain*, 626 N.W.2d at 124-25). Rather, as alleged, what McLeodUSA provided was not *information* about the appropriate telecommunications services for a particular customer, but telecommunications services themselves. Again, the alleged provision of misinformation on which Qwest's negligent misrepresentation claims are based was only incidental to the provision of telecommunications services that McLeodUSA provided, but

was not the service itself.  Thus, even as alleged by Qwest, the facts provide no basis for concluding that McLeodUSA was in the business of supplying information, and as a consequence, Qwest's negligent misrepresentation claims suffer from an insuperable bar to assertion of such claims under Iowa law, warranting their dismissal.  *Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

Qwest attempts to salvage its negligent misrepresentation claims by asserting that McLeodUSA had a pecuniary interest in providing false information to Qwest, so that Qwest would not charge McLeodUSA at all or would not charge the proper tariffs for various calls.  This argument also fails, even though this court has acknowledged that, under some circumstances, a pecuniary interest in the business may be a basis for imposing the duty of care required to sustain a negligent misrepresentation claim.  *Conveyor Co.*, 398 F. Supp. 2d at 1016 (acknowledging that pecuniary interest in the business is an additional basis for imposing a duty of care, but finding that the pecuniary interest in selling a hydraulic lift system was not the sort of pecuniary interest that would invoke the duty upon which a negligent misrepresentation claim could be based).  The pecuniary interest alleged here is not sufficient to create the requisite duty.  Again, Qwest has not alleged that McLeodUSA was "'act[ing] in an advisory capacity,'" even if it was "'manifestly aware of the use'" to which the information provided with its calls would be put in determining the access fees or charges for the calls, and intended to supply the information for its pecuniary interest of escaping certain charges.  *Id.* (quoting *Sain*, 626 N.W.2d at 124-25).  Information used to route and charge for McLeodUSA's telephone

34

calls was provided only "'incidentally'" to a different service, telecommunications services, so that provision of that information did not impose the necessary duty. *Id.* (quoting *Greatbatch*, 534 N.W.2d at 118). In other words, what was involved here was "an arms-length and adversarial transaction" in which McLeodUSA routed calls to Qwest, perhaps with inaccurate information from which access charges would be determined, and Qwest provided the required network access to complete the calls. *See Jensen,* 696 N.W.2d at 588 (an "arms-length and adversarial transaction" will not sustain a negligent misrepresentation claim). Under these circumstances, McLeodUSA's pecuniary interest in its business of providing telecommunications services, and even its pecuniary interest in reducing its costs by misrepresenting the nature of the calls, simply does not create the sort of duty that would sustain a negligent misrepresentation claim.

Finally, Qwest argues that it was harmed in its relations with third parties by misinformation provided by McLeodUSA, so that its negligent misrepresentation claims should be allowed to go forward. The Iowa Supreme Court has explained that "'the tort does not apply when a defendant directly provides information to a plaintiff in the course of a transaction between the two parties, which information harms the plaintiff in the transaction with the defendant,'" and that the tort, instead, "'predominately applies to situations where the information supplied harmed the plaintiff in its relations with third parties.'" *See Sturm*, 713 N.W.2d at 5 (quoting *Sain*, 626 N.W.2d at 126). Thus, an allegation of harm in relations with third parties from the misrepresentations of the tortfeasor is one requirement of the claim. *Id.* Unfortunately for Qwest, two of Qwest's negligent misrepresentation counterclaims allege only that the alleged misrepresentations were made in the course of transactions between Qwest and McLeodUSA, and that the information harmed Qwest in its relationship with McLeodUSA. Specifically, Qwest has alleged in Count VI that the alleged misrepresentations by McLeodUSA "cause[d] Qwest

not to collect access charges for calls to these certain 8XX numbers" provided by McLeodUSA. Counterclaims, Count VI, ¶ 168. Similarly, in Count XIX, Qwest has alleged that McLeodUSA misrepresented information about interLATA calls and that, "[a]s a result, McLeod has avoided charges from Qwest for McLeod's use of Qwest's services." *Id.* at Count XIX, ¶ 265. Thus, these negligent misrepresentation counterclaims allege only that Qwest was harmed in its relationship with McLeodUSA by McLeodUSA's alleged misrepresentations, and such allegations are insufficient to sustain these negligent misrepresentation claims. *Sturm*, 713 N.W.2d at 5. Consequently, there is a further "insuperable bar" to the negligent misrepresentation counterclaims in Counts VI and XIX, requiring dismissal of those counterclaims for failure to state claims upon which relief can be granted. *See Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). The last of Qwest's negligent misrepresentation counterclaims, in Count XXIX, does not suffer from this deficiency, because it does allege that McLeodUSA's alleged misrepresentations about INS terminating access charges caused Qwest to suffer harm in its relationship with third parties, INS and Iowa ILECs, because those third parties billed Qwest for terminating access charges that McLeodUSA was legally responsible to pay. Counterclaims, Count XXIX, ¶ 346. However, as explained above, this Count does suffer from the deficiency of failure to allege that McLeodUSA was in the business or profession of supplying information. Therefore, it is still subject to dismissal on that ground, as are Qwest's other negligent misrepresentation claims.

Therefore, the court will grant that part of McLeodUSA's motion to dismiss seeking dismissal of Qwest's negligent misrepresentation counterclaims in Counts VI, XIX, and XXIX.

### 2. *The conversion counterclaims*

As explained in more detail above, Qwest asserts three counterclaims for "conversion": Counts VII (regarding Qwest's 8XX access charges), XXV (regarding interLATA access charges), and XXXIII (regarding INS terminating access charges). McLeodUSA seeks dismissal of all of these conversion counterclaims.

### *a. Arguments of the parties*

In its opening brief in support of its motion to dismiss, McLeodUSA argues that Qwest's conversion counterclaims rely on McLeodUSA's alleged failure to pay or reimburse Qwest for its services as required under various contracts. Thus, McLeodUSA argues that these "tort" claims do not state claims upon which relief can be granted, because they are not based on any duty independent of contract and rely on the same acts that Qwest asserts are breaches of contract. In response, Qwest argues that its conversion counterclaims do not require proof of any independent duty at all, so that they can co-exist with Qwest's contract claims. More specifically, Qwest alleges that its allegations that McLeodUSA has seriously interfered with Qwest's property rights by stealing access to Qwest's network to use that network for McLeodUSA's own purposes are sufficient to sustain its conversion claims. In its reply, although McLeodUSA concedes as unremarkable the principle that contract and tort claims can co-exist, McLeodUSA nevertheless maintains that Qwest has not asserted a cognizable claim for conversion that is separate and apart from its claim for breach of contract. This is so, McLeodUSA argues, because the essence of its challenge to the conversion claims is that they are just contract claims dressed up in the semantics of conversion, but the only legally cognizable

rights are the rights advanced in the contract claims. McLeodUSA contends that, under Iowa law, something more than routing of telecommunications traffic in a way that violates applicable interconnection agreements (ICAs) is required, because no cited case has recognized such a conversion claim, and it is not even settled that a conversion claim can apply to intangible property. McLeodUSA also argues that Qwest has not alleged that McLeodUSA exercised any control over Qwest's network *to the exclusion of Qwest*, as required for a conversion claim to lie. Ultimately, McLeodUSA argues that all Qwest has alleged is that McLeodUSA placed certain codes in calls that cause Qwest's automated systems to allow certain call traffic to transit Qwest's network in ways that Qwest asserts are not permitted by the applicable ICAs. As such, McLeodUSA contends that these claims are not independent claims for conversion.

### b.    *Applicable law*

This court has examined Iowa law applicable to conversion claims, identifying the controlling principles as follows:

> Under Iowa law, a "conversion" is described as "'the wrongful control or dominion over another's property contrary to that person's possessory right to the property.'" *Whalen v. Connelly,* 621 N.W.2d 681, 687 (Iowa 2000) (quoting *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 593 (Iowa 1999)). "Conversion" is the "civil equivalent" of theft. *Iowa v. Hollinrake,* 608 N.W.2d 806, 808 (Iowa Ct.App.2000). Thus, "[c]onversion is the intentional exercise of control over property 'which so seriously interferes with the right of another to control it that the actor may justly be required to pay ⋯ the full value of the chattel.'" *Id.* (quoting Restatement (Second) of Torts § 222A(1)); *see also Condon Auto Sales,* 604 N.W.2d at 593 ("Conversion is the wrongful control or dominion over another's property contrary to that person's possessory right to the property. *Ezzone v. Riccardi,* 525 N.W.2d 388, 396 (Iowa 1994). The wrongful control must

amount to a serious interference with the other person's right to control the property. *Kendall/Hunt Publ'g Co. v. Rowe,* 424 N.W.2d 235, 247 (Iowa 1988) (citing Restatement (Second) of Torts § 222A(1) (1965))."). This court has explained,

> Iowa courts list the following factors as appropriate to consider whether the interference is sufficiently serious to find a conversion:
>
>> (a) the extent and duration of the actor's exercise of dominion or control;
>> (b) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>> (c) the actor's good faith;
>> (d) the extent and duration of the resulting interference with the other's right of control;
>> (e) the harm done to the chattel;
>> (f) the inconvenience and expense caused to the other.
>
> *Kendall/Hunt,* 424 N.W.2d at 247; *McCray [v. Carstensen],* 492 N.W.2d [444,] 445 [(Iowa Ct. App. 1992)]; *Larson [v. Great West Cas. Co.],* 482 N.W.2d [170,] 174 [(Iowa Ct. App. 1992)].
>
> *Rural Water Sys. No. 1 v. City of Sioux Center, Iowa,* 29 F. Supp. 2d 975, 997 (N.D. Iowa 1998), *aff'd in pertinent part and rev'd on other grounds,* 202 F.3d 1035 (8th Cir. 2000), *cert. denied,* 531 U.S. 820, 121 S. Ct. 61, 148 L. Ed. 2d 28 (2000).

*Sioux Biochem., Inc. v. Cargill, Inc.,* 410 F. Supp. 2d 785, 800 (N.D. Iowa 2005). In *Sioux Biochemical*, this court noted that no Iowa decision barred a conversion claim based on "intangible" property rights and that, in light of the factors for determining whether or not an interference was sufficiently serious to constitute a conversion, the court could not conclude as a matter of law that a claim for conversion would not lie for intangible

property interests; therefore, the court declined to dismiss a claim for conversion of intellectual property rights. *Id.* at 800-02.

### c. *Analysis*

The court does not find any basis for dismissing Qwest's conversion counterclaims. First, contrary to McLeodUSA's fundamental argument for dismissal of these claims, the court cannot find that the only "rights" upon which Qwest's conversion counterclaims are based are "contract" rights. Rather, each of Qwest's conversion counterclaims is premised on allegations that Qwest has "a property right in its proprietary network, which includes buildings, equipment, wires, and computers," and other "resources," "including employees and tangible items, that are necessary to service, repair, operate, maintain and upgrade its network," and that "McLeod intentionally and wrongfully interfered with Qwest's property by using Qwest's network without authorization." *See* Counterclaims, Count VII, ¶¶ 177-78; Count XXV, ¶¶ 307-08; and Count XXXIII, ¶¶ 369-70. Thus, the rights allegedly violated are, as required by the tort claim, possessory rights in property. *See Sioux Biochem.*, 410 F. Supp. 2d at 800. The violation of these rights, in each of Qwest's conversion counterclaims, is alleged to be use of Qwest's property "without authorization," which reasonably suggests violation of a contract *or the absence of a contract* pertaining to authorized use of the particular property in question. In either case, the right that has allegedly been violated is not merely a contractual right, but *a possessory right in the property*.

Second, McLeodUSA's argument that the Iowa Supreme Court has not recognized a claim for conversion of intangible property is a red herring. Although a decision of the Iowa Supreme Court expressly rejecting such a claim would stand as an "insuperable bar," failure of the Iowa Supreme Court to recognize the claim, in the absence of any opportunity to do so, does not present such an "insuperable bar." *See Frey*, 44 F.3d at

671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). For this reason, although this court noted in *Sioux Biochemical* that the Iowa Supreme Court had not expressly recognized a claim for conversion of intangible property, this court, nevertheless, held that a claim for conversion of intangible property rights—in that case, intellectual property rights—was not subject to dismissal, because the viability of the claim did not rest upon failure of the Iowa Supreme Court to recognize such a claim or even upon a tangible/intangible property distinction, but upon the pertinent factors for determining whether the interference with the claimant's property rights was sufficiently serious. *Id.* at 800-02. Similarly, here, the question is whether the factual allegations in support of pertinent factors are sufficient to sustain the claim, and the court concluded above that they are. Still more fundamentally, this argument is a red herring, because at least some of the property rights upon which Qwest bases its conversion claims are rights in "tangible" property, such as rights in buildings, equipment, wires, and computers. Thus, Qwest has based its conversion counterclaims, at least in part, on violation of its possessory rights in "tangible" property. *Id.*

Similarly, McLeodUSA's argument that Qwest has not alleged that McLeodUSA exercised control over Qwest's network *to the exclusion of Qwest* and its argument that Qwest has not alleged that McLeodUSA's exercise of control destroyed the value of the network are red herrings. McLeodUSA has not cited, and this court has not found, any Iowa case holding or reasonably suggesting that either exclusion of the claimant from its property or destruction of the value of the property is *required* to establish a conversion claim, although either would likely be *sufficient* to prove such a claim. *See, e.g., Welke*

*v. City of Davenport*, 309 N.W.2d 450, 451 (Iowa 1981) (defining a conversion as "a distinct act of dominion wrongfully exerted over another's property *in denial of or inconsistent with* the owner's title or rights therein, *or* in derogation, *exclusion*, or defiance of such title or rights") (emphasis added). Rather, as formulated under Iowa law, the question for a conversion claim is whether the tortfeasor exercised control over the claimant's property that "'so seriously interfere[d] with the right of another to control it that the actor may justly be required to pay ⋯ the full value of the chattel.'" *Whalen,* 621 N.W.2d at 687 (quoting *Condon Auto Sales & Serv., Inc.*, 604 N.W.2d at 593) (quoted in *Sioux Biochem.*, 410 F. Supp. 2d at 800). Furthermore, to determine whether or not there has been a conversion, "the extent and duration of the actor's exercise of dominion or control" and "the extent and duration of the resulting interference with the other's right of control" are relevant factors, *see Kendall/Hunt,* 424 N.W.2d at 247 (cited in *Sioux Biochem.*, 410 F. Supp. 2d at 800), but no factor requires *permanent* exercise of dominion or control or *complete* interference with the other's right of control. Similarly, while "the inconvenience and expense caused to the other" is a relevant factor, this factor does not require *complete* destruction of the value of the property. *Id.*

Finally, even if the "rights" at issue in Qwest's conversion counterclaims somehow only overlap or are only coextensive with its contract rights, such overlap is not necessarily a ground for dismissal of the conversion counterclaims. As this court explained in *Sioux Biochemical*, "[W]hile a party may not ultimately recover duplicative damages, a party is generally entitled to assert alternative theories for relief." *Sioux Biochem.*, 410 F. Supp. 2d at 801-02 (citing FED. R. CIV. P. 8(e)(2), which provides, "A party may set forth two or more statements of a claim . . . alternately or hypothetically. . . . A party may also state as many separate claims . . . as the party has regardless of consistency," and *Peter Kiewit Sons' Co. v. Summit Constr. Co.,* 422 F.2d 242, 271 (8th Cir. 1969), which states,

"Federal Rule of Civil Procedure 8(e)(2) clearly permits setting forth two or more statements of a claim alternately or hypothetically and stating as many separate claims as may exist regardless of consistency, subject of course to the qualification that the plaintiff's attorney must sign the complaint, his signature constituting a certificate that he has read the pleading and to the best of his knowledge, information and belief there is good ground to support it and it is not interposed for delay."). Thus, even if Qwest's conversion counterclaims are based on the same rights and factual allegations as its contract counterclaims, such overlap would not constitute an "insuperable bar" to the conversion counterclaims warranting dismissal, because Qwest is allowed to plead alternative theories for relief. *See Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

Therefore, the court will deny that part of McLeodUSA's motion to dismiss seeking dismissal of Qwest's conversion counterclaims in Counts VII, XXV, and XXXIII.

### 3. The trespass counterclaims

As explained above, Qwest asserts three counterclaims for "trespass": Count VIII (regarding Qwest's 8XX access charges), Count XXVI (regarding InterLATA access charges) and Count XXXIV (regarding INS terminating access charges). McLeodUSA has also moved to dismiss these counterclaims.

### a. Arguments of the parties

In its opening brief in support of its motion, McLeodUSA seeks dismissal of Qwest's trespass counterclaims based on the same argument that McLeodUSA asserts for dismissal of Qwest's conversion counterclaims: that these "tort" claims do not state claims

upon which relief can be granted, because they are not based on any duty independent of contract and rely on the same acts that Qwest asserts are breaches of contract. Qwest's response is also the same: that its trespass counterclaims do not require proof of any independent duty at all, so that they can co-exist with Qwest's contract claims. Qwest alleges that its allegations that McLeodUSA has seriously interfered with Qwest's property rights by stealing access to Qwest's network to use that network for McLeodUSA's own purposes and that McLeodUSA was not rightfully upon or using the land or property of Qwest are sufficient to sustain its trespass claims. In reply, McLeodUSA argues, for the first time, that Iowa law has never recognized a tort of trespass to chattels such as a telecommunications network and that, although Iowa courts have recognized claims of trespass to real property, Qwest has not alleged that its network is real property. Moreover, to the extent that Qwest states any actionable wrong in its trespass counterclaims, McLeodUSA argues that Qwest has alleged only that McLeodUSA's use of Qwest's network violates the terms of the applicable ICAs, and thus, should be dismissed for the same reasons that the court should dismiss Qwest's conversion claims.

### b. Applicable law

The Iowa Supreme Court has recognized that "[t]he gist of a claim for trespass on land is the wrongful interference with one's possessory rights in property." *See Robert's River Rides, Inc. v. Steamboat Development Corp.*, 520 N.W.2d 294, 301 (Iowa 1994), *abrogated on other grounds by Barreca v. Nicolas*, 683 N.W.2d 111 (Iowa 2004). Thus, one is subject to liability to another for trespass on land if one "'intentionally (a) enters

land in possession of the other, or (b) remains on land.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 158).[4]

In addition to trespass on land, which is expressly recognized as a civil cause of action under Iowa law, the RESTATEMENT (SECOND) OF TORTS recognizes a cause of action for "trespass to chattel," which is defined as "intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." RESTATEMENT (SECOND) OF TORTS § 217. In the applicable comments, "intermeddling" is defined as "intentionally bringing about a physical contact with the chattel." *Id.* at cmt. *e.*

### c.    *Analysis*

As with Qwest's conversion counterclaims, the court does not find any basis for dismissing Qwest's trespass counterclaims. First, contrary to McLeodUSA's fundamental argument for dismissal of these claims, the court cannot find that the only "rights" upon which Qwest's trespass counterclaims are based are "contract" rights. Rather, each of Qwest's trespass counterclaims, like each of Qwest's conversion counterclaims, is premised on allegations that Qwest has "a property right in its proprietary network, which includes buildings, equipment, wires, and computers," and other "resources," "including employees and tangible items, that are necessary to service, repair, operate, maintain and upgrade its network," and that "McLeod intentionally and wrongfully interfered with Qwest's property by using Qwest's network without authorization." *See* Counterclaims,

---

[4]The third way in which one can commit a trespass upon land defined in RESTATEMENT (SECOND) OF TORTS § 158, but not quoted in *Robert's River Rides*, is "intentionally . . . (c) fail[ing] to remove from the land a thing which [the person] is under a duty to remove." RESTATEMENT (SECOND) OF TORTS § 158(c). Such a trespass was not at issue in *Robert's River Rides*, and does not appear to be at issue here, based on the court's review of the allegations.

Count VIII, ¶¶ 187-88; Count XXVI, ¶¶ 317-18; and Count XXXIV, ¶¶ 378-79. Thus, the rights allegedly violated are, as required by the tort claim, possessory rights in property. *See Robert's River Rides*, 520 N.W.2d at 301 ("The gist of a claim for trespass on land is the wrongful interference with one's possessory rights in property."); RESTATEMENT (SECOND) OF TORTS § 217 (defining "trespass to chattel" as "intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another."). The violation of these rights, in each such count, is alleged to be use of Qwest's property "without authorization," which reasonably suggests violation of a contract *or the absence of a contract* pertaining to authorized use of the particular property in question. In either case, the right that has allegedly been violated is not merely a contractual right, but *a possessory right in the property*. Thus, Qwest has pleaded that McLeodUSA has used the property in question without authorization, which is sufficient allegation of "interference" with property rights in land and "using" a chattel without authorization to sustain the claim. *See id.* (trespass on land requires interference with one's possessory rights in property); RESTATEMENT (SECOND) OF TORTS § 217 (trespass to chattel requires, as one alternative, "using . . . a chattel in the possession of another").

Second, McLeodUSA's argument that the Iowa Supreme Court has not recognized a claim for trespass except as to trespass on real property is a red herring. This court has found no Iowa state court decision expressly recognizing a cause of action for trespass to chattel, but neither has this court found any Iowa state court decision expressly rejecting such a claim. Moreover, the Iowa Court of Appeals has suggested that such a claim is viable by looking to related provisions of the RESTATEMENT (SECOND) OF TORTS to impose a reasonableness requirement on removal of personal property of another from one's property in the context of a conversion claim. *See Crawley v. Price*, 692 N.W.2d 44, 50 (Iowa Ct. App. 2004) (relying on § 260, which defines a privilege to commit an act that

would otherwise be a trespass to chattel or conversion, to impose a reasonableness requirement on removal of personal property of another from premises in the claimant's possession). Again, a decision of the Iowa Supreme Court expressly rejecting such a claim would stand as an "insuperable bar," but failure of the Iowa Supreme Court to recognize the claim expressly, in the absence of any opportunity to do so, does not present such an "insuperable bar." *See Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim). Where there has been no such rejection, the question is whether the factual allegations in support of the claim are sufficient to sustain the claim, and the court concluded above that they are.

Finally, even if the "rights" at issue in Qwest's trespass counterclaims somehow only overlap or are only coextensive with its contract rights, as with Qwest's conversion counterclaims, such overlap is not necessarily a ground for dismissal of those counterclaims. Again, "while a party may not ultimately recover duplicative damages, a party is generally entitled to assert alternative theories for relief." *Sioux Biochem.*, 410 F. Supp. 2d at 801-02 (citing FED. R. CIV. P. 8(e)(2), which provides, "A party may set forth two or more statements of a claim . . . alternately or hypothetically. . . . A party may also state as many separate claims . . . as the party has regardless of consistency," and *Peter Kiewit Sons' Co. v. Summit Constr. Co.,* 422 F.2d 242, 271 (8th Cir. 1969), which states, "Federal Rule of Civil Procedure 8(e)(2) clearly permits setting forth two or more statements of a claim alternately or hypothetically and stating as many separate claims as may exist regardless of consistency, subject of course to the qualification that the plaintiff's attorney must sign the complaint, his signature constituting a certificate that he

47

has read the pleading and to the best of his knowledge, information and belief there is good ground to support it and it is not interposed for delay."). Thus, even if Qwest's trespass counterclaims are based on the same rights and the same factual basis as its contract counterclaims, such overlap would not constitute an "insuperable bar" to the trespass counterclaims warranting dismissal, because Qwest is entitled to plead alternative theories for relief. *See Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

Therefore, the court will deny that part of McLeodUSA's motion to dismiss seeking dismissal of Qwest's trespass counterclaims in Counts VIII, XXVI, and XXXIV.

### 4. *The fraud counterclaim*

Qwest asserts one counterclaim for fraud: Count XVII, regarding interLATA access charges. McLeodUSA has also moved to dismiss this counterclaim.

#### a. *Arguments of the parties*

In its opening brief in support of its motion to dismiss Qwest's fraud counterclaim, McLeodUSA once again argues that this "tort" claim does not state a claim upon which relief can be granted, because it is not based on any duty independent of contract and relies on the same acts that Qwest asserts are breaches of contract. Qwest responds, once again, that its fraud counterclaim does not require proof of any independent duty at all and can co-exist with its contract claims. More specifically, Qwest argues that it has adequately pleaded that McLeodUSA knowingly made material misrepresentations concerning call information with the intent to disguise the true nature of the calls, that the misrepresentations were made to induce Qwest not to charge proper access charges for

those calls, and that Qwest justifiably relied on the false information to its detriment by failing to charge properly for the calls, because Qwest cannot police the billions of calls that it receives from McLeodUSA and many other carriers to verify the routing information provided with each call. McLeodUSA offers no specific reply to Qwest's argument concerning the fraud counterclaim.

### b. Applicable law

Under Iowa law, to prove a claim (or counterclaim) of fraud, the claimant must prove (1) a representation by the opposing party, (2) falsity of the representation, (3) scienter *(i.e.,* knowledge of falsity), (4) intent to deceive, (5) materiality of the misrepresentation, and (6) justifiable reliance by the claimant upon the representation, resulting in injury to the claimant. *See Smidt v. Porter,* 695 N.W.2d 9, 22 (Iowa 2005). The "knowledge of falsity" and "intent to deceive" elements distinguish an action at law for damages for fraud from an equitable action to rescind a contract, because "even innocent misrepresentations may be sufficient to support an action for rescission," but they are *not* sufficient to support a fraud action at law for damages. *Hyler v. Garner*, 548 N.W.2d 864, 872 (Iowa 1996).[5]

### c. Analysis

The court does not find any basis for dismissing Qwest's fraud counterclaim. First, contrary to McLeodUSA's fundamental argument for dismissal of this counterclaim, the court cannot find that this counterclaim is based only on a duty arising from contract or that it relies only on the same acts alleged to be breaches of contract. Rather, Qwest's fraud counterclaim is premised on allegations that McLeodUSA knowingly made material

---

[5]Although fraud claims must be pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, McLeodUSA does not appear to challenge the sufficiency of the pleading of Qwest's fraud counterclaim under Rule 9(b).

false representations about the originating jurisdiction for interLATA calls terminating to Qwest over Local Interconnection Service facilities intending to deceive Qwest into believing that the calls were only local calls for which no charge or only a relatively small charge would be applicable for terminating the calls; that Qwest justifiably relied on the information provided, because it could not police all of the calls transiting its network; and that Qwest was damaged by failing to obtain the proper charges. *See* Counterclaims, Count XVII, ¶¶ 241-45. These allegations satisfy the elements of a fraud claim, which do not depend upon any contractual duty, *see Smidt*, 695 N.W.2d at 22, and, moreover, allege wrongdoing *even in the absence of any contract* between the parties concerning charges for terminating interLATA calls.

Moreover, even to the extent that the fraud counterclaim could be construed to be factually co-extensive with Qwest's contract counterclaims, "while a party may not ultimately recover duplicative damages, a party is generally entitled to assert alternative theories for relief." *Sioux Biochem.*, 410 F. Supp. 2d at 801-02 (citing FED. R. CIV. P. 8(e)(2), which provides, "A party may set forth two or more statements of a claim . . . alternately or hypothetically. . . . A party may also state as many separate claims . . . as the party has regardless of consistency," and *Peter Kiewit Sons' Co. v. Summit Constr. Co.*, 422 F.2d 242, 271 (8th Cir. 1969), which states, "Federal Rule of Civil Procedure 8(e)(2) clearly permits setting forth two or more statements of a claim alternately or hypothetically and stating as many separate claims as may exist regardless of consistency, subject of course to the qualification that the plaintiff's attorney must sign the complaint, his signature constituting a certificate that he has read the pleading and to the best of his knowledge, information and belief there is good ground to support it and it is not interposed for delay."). Thus, Qwest's alternative pleading of a fraud counterclaim would not constitute an "insuperable bar" to such a counterclaim warranting dismissal. *See Frey*,

44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

Therefore, the court will deny that part of McLeodUSA's motion to dismiss seeking dismissal of Qwest's fraud counterclaim in Count XVII.

### 5.  *The fraudulent concealment counterclaims*

Qwest asserts two counterclaims for fraudulent concealment: Counts XVIII (regarding interLATA access charges) and XXVIII (regarding INS terminating access charges).  McLeodUSA has also moved to dismiss these counterclaims.

#### a.  *Arguments of the parties*

Once again, in its opening brief, McLeodUSA argues that these counterclaims should be dismissed, because they stem directly from the very same acts that Qwest asserts are breaches of contract and that the source of the "duty" underlying these claims is simply the contracts at issue in the contract claims.  In response, Qwest argues that Iowa law recognizes that McLeodUSA owes a duty of truthfulness to Qwest in the performance of its contracts and business transactions and that McLeodUSA's sole control of the pertinent information about the calls created a relationship of trust based on inequality of information.  Thus, Qwest asserts that it has adequately alleged a legal and factual basis for a duty to disclose on McLeodUSA's part, and that McLeodUSA breached that duty by failing to make the necessary disclosures.  In reply, McLeodUSA argues that the purported relationship of trust upon which Qwest has based its fraudulent concealment counterclaims is not supported by any adequate factual allegations, where Qwest and McLeodUSA were engaged in an arm's-length business transaction between sophisticated business entities.

### b.    Applicable law

The elements of a claim of fraudulent non-disclosure or concealment are essentially the same as the elements of fraud, although the first element requires a false representation or concealment of a material fact when under a legal duty to disclose that fact. *See, e.g., In re Marriage of Cutler*, 588 N.W.2d 425, 430 (Iowa 1999) (citing *Clark v. McDaniel*, 546 N.W.2d 590, 492 (Iowa 1996)). Thus, where the fraud was purportedly a nondisclosure or concealment, the claimant must show that the alleged tortfeasor was under a legal duty to communicate the withheld information to prevail (or must so plead to state a claim). *See, e.g., Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 139 F. Supp. 2d 1071, 1104 (N.D. Iowa 2001) (summarizing Iowa law on fraudulent misrepresentation and fraudulent nondisclosure). Iowa cases have not provided a specific test for determining when a duty to disclose arises in fraudulent nondisclosure cases. *See Clark*, 546 N.W.2d at 592 (citing *Sinnard v. Roach*, 414 N.W.2d 100, 106 (Iowa 1987)); *Arthur v. Brick*, 565 N.W.2d 623, 625 (Iowa Ct. App. 1997). They have, however, observed that, to prove the necessary duty to disclose, the plaintiff need not show a fiduciary duty existed, but may, instead, establish that a duty arose from "inequality of condition and knowledge, or other circumstances shown by a particular fact situation." *Irons v. Community State Bank,* 461 N.W.2d 849, 854 (Iowa Ct. App. 1990); *see Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 740 (8th Cir. 2002) (noting that, under Iowa law, a duty to reveal arises when "'one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact involved in the transaction.'") (quoting *Clark*, 546 N.W.2d at 592). Thus, "for concealment to be actionable, the representation must relate to a material matter known to the party . . . which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and

knowledge, or other attendant circumstances." *Clark*, 546 N.W.2d at 592; *Sinnard*, 414 N.W.2d at 105 (stating the same standard). The Iowa Supreme Court "has recognized a duty to disclose in situations where the plaintiff and the defendant were involved in some type of business transaction, such as buyer/seller or owner/contractor," but only when the relative knowledge and experience of the parties warrants. *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002) (citing cases). The duty to disclose may also arise "from the 'attendant circumstances,' such as a '"contrivance intended to exclude suspicion and prevent inquiry."'" *Id.* at 175 (quoting *Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286, 293 (Iowa 1975), in turn quoting 37 AM.JUR.2D, *Fraud and Deceit* § 145 (1968), and involving a dispute between a buyer and seller of land).[6]

### c.    *Analysis*

The fatal defect in McLeodUSA's contention that Qwest's fraudulent concealment claims merely rely on a contractual duty is that the duty to disclose material facts does not necessarily arise from contract, either legally or as alleged in this case. Rather, legally, the duty may arise, for example, from inequality of condition and knowledge, *see Schaller*, 298 F.3d at 740; *Wright*, 652 N.W.2d at 174; *Irons,* 461 N.W.2d at 854, or from circumstances attending the parties' relationship, including "contrivance intended to exclude suspicion and prevent inquiry" *Wright*, 652 N.W.2d at 175 (internal quotation marks and citations omitted). Here, Qwest has alleged that the duty to disclose the true nature of the calls at issue in the fraudulent concealment claims arose, *inter alia*, from McLeodUSA's sole control of information relating to calls that it sends to Qwest, *see*

---

[6]Again, fraudulent concealment claims must be pleaded with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure, but McLeodUSA does not appear to challenge the sufficiency of the pleading of Qwest's fraudulent concealment counterclaims under Rule 9(b).

Counterclaims, Count XVIII, ¶ 254, and Qwest's inability to identify McLeodUSA as the source of call traffic in the absence of proper information, *see* Counterclaims, Count XXVIII, ¶ 335,[7] placing the parties in a position of inequality of knowledge. These allegations are sufficient to state the necessary duty for fraudulent non-disclosure claims, independent of any contractual duty. *See Schaller*, 298 F.3d at 740; *Wright*, 652 N.W.2d at 174; *Irons,* 461 N.W.2d at 854. Moreover, it is apparent from Qwest's allegations that Qwest is also alleging that McLeodUSA's misrepresentation of call information was a "contrivance intended to exclude suspicion and prevent inquiry," which may also give rise to the duty to disclose. *Wright*, 652 N.W.2d at 175. Thus, the "duties" and facts upon which Qwest's fraudulent concealment counterclaims are based are independent of the duties and facts allegedly giving rise to Qwest's contract claims.

Again, finding no other "insuperable bar" to the fraudulent concealment counterclaims, as pleaded, that would warrant dismissal, *see Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim), and even supposing that the fraudulent concealment counterclaims rely simply on the duties and facts also allegedly giving rise to Qwest's contract claims, Qwest "is generally entitled to assert alternative theories for relief." *Sioux Biochem.*, 410 F. Supp.

---

[7]Qwest also identifies the source of the duty to disclose in ¶ 334 of Count XXVIII as "sources of law" identified in ¶ 333, which include unspecified state and federal communications laws that require a seamless interoperability of telephone networks and exchange of call traffic, and that prohibit disguising toll traffic as local traffic. However, these sources of law are also all independent of contract.

2d at 801-02 (citing FED. R. CIV. P. 8(e)(2)). Thus, the court will not dismiss the fraudulent concealment counterclaims where Qwest has properly pleaded them as alternative theories for relief.

Therefore, the court will deny that part of McLeodUSA's motion to dismiss seeking dismissal of Qwest's fraudulent concealment counterclaims in Counts XVIII and XXVIII.

### 6.     *The negligence counterclaims*

Finally, the court turns to the portion of McLeodUSA's motion seeking to dismiss Qwest's "negligence" counterclaims in Counts XXII and XXX.

#### a.     *Arguments of the parties*

In its initial brief, McLeodUSA asserts the now familiar argument that Qwest's negligence counterclaims should be dismissed, because they stem directly from the very same acts that Qwest asserts are breaches of contract and that the source of the "duty" underlying these claims is simply the contracts at issue in Qwest's contract claims. Although Qwest acknowledges that negligence claims do require a showing of a duty, Qwest nevertheless argues that it has identified duties independent of contract upon which to base it negligence claims. Specifically, Qwest points out that, under Iowa law, a statute or regulation can be sufficient to establish the necessary duty, that breach of such a statute or regulation can give rise to an action for negligence, and that it has pleaded that Iowa state regulations forbid carriers from routing "toll" calls to Qwest over "local interconnection facilities" that are dedicated to local calls. Qwest contends, further, that federal and state telecommunications laws require McLeodUSA to pay INS and ILECs terminating access charges, even if calls transit Qwest's network. Qwest argues that its allegations of breach of these duties, and the resulting damage, suffice to state claims of negligence. In reply, McLeodUSA argues that not every violation of a statute or regulation gives rise to an independent duty that would support a negligence claim. Here,

McLeodUSA argues, Qwest has alleged nothing more than breaches of agreements between the parties.

### b. *Applicable law*

As the Iowa Supreme Court recently explained, "An actionable claim of negligence includes [1] 'the existence of a duty to conform to a standard of conduct to protect others, [2] a failure to conform to that standard, [3] proximate cause, and [4] damages.'" *Stotts v. Eveleth*, 688 N.W.2d 803, 807 (Iowa 2004) (quoting *Van Essen v. McCormick Enters. Co.*, 599 N.W.2d 716, 718 (Iowa 1999)). That court also explained, "We look to legislative enactments, prior judicial decisions, and general legal principals as a source for the existence of a duty." *Id.* Even if a duty can be identified from one of these sources, however, "violation of that duty does not necessarily give rise to a tort claim." *Id.* (citing *Sanford v. Manternach*, 601 N.W.2d 360, 371 (Iowa 1999)). Instead, "a violation gives rise to a private cause of action only when the statute, explicitly or implicitly, provides for such an action." *Id.* When there is no explicit statement of a right to a private cause of action under a statute or regulation, the Iowa Supreme Court considers the following four-factor test to see if a private cause of action can be implied:

> (1) Is the plaintiff a member of the class for whose benefit the statute was enacted? (2) Is there any indication of legislative intent, explicit or implicit, to either create or deny such a remedy? (3) Would allowing such a cause of action be consistent with the underlying purpose of the legislation? (4) Would the private cause of action intrude into an area over which the federal government or a state administrative agency holds exclusive jurisdiction?

*Stotts*, 688 N.W.2d at 808 (quoting *Kolbe v. State*, 625 N.W.2d 721, 726-27 (Iowa 2001)). Failure to satisfy any one of these four factors is fatal to the existence of a private cause of action. *Id.* Moreover, if the court cannot infer a private cause of action for a statutory

violation, the court will likewise refuse to infer such a private cause of action from the violation of a rule enacted to carry out the statutory directive. *Id.*

### c. Analysis

Even though a duty under a statute or regulation may be sufficient to give rise to a claim for negligence when the statute or regulation is violated, *see id.*, and even though Qwest alleges that its negligence claims are premised on violations of various duties created by state and federal regulations, nowhere in its Counterclaims does Qwest explicitly identify the statutes or regulations on which it relies in its negligence counterclaims. Moreover, nowhere in its Counterclaims does Qwest plead or plead a basis for finding that any of the unidentified statutes or regulations, explicitly or implicitly, provide for a private cause of action if they are violated. *Id.* Because "duty" is an essential element of a negligence claim under Iowa law, *see id.*, and because Qwest has failed to plead any adequate basis for finding such a duty, there is an "insuperable bar" to Qwest's negligence counterclaims warranting dismissal of those counterclaims. *See Frey*, 44 F.3d at 671 ("A motion to dismiss should be granted as a practical matter only in the unusual case in which a [claimant] includes allegations that show on the face of the [pleading] that there is some insuperable bar to relief.") (internal quotation marks and ellipses omitted); *accord Parnes*, 122 F.3d at 546 (also considering whether there is an "insuperable bar to relief" on the claim).

Therefore, the court will grant that part of McLeodUSA's motion to dismiss seeking dismissal of Qwest's "negligence" counterclaims in Counts XXII and XXX.

### III.  CONCLUSION

Contrary to McLeodUSA's contentions, the court finds that many of Qwest's "tort" counterclaims either do not require allegations of a "duty" or have been pleaded on the basis of "duties" that are independent of the contracts between the parties.  Moreover, even to the extent that some of Qwest's "tort" counterclaims could be construed to rely only on the same facts that give rise to Qwest's "contract" counterclaims, Qwest is entitled, at least at this stage of the proceedings, to assert alternative theories for relief. Thus, the court will deny McLeodUSA's motion to dismiss as to the greater part of the counterclaims that McLeodUSA challenged therein.  On the other hand, the court finds that McLeodUSA's motion to dismiss should be granted as to certain of the challenged counterclaims for failure to plead essential elements of those claims.  Specifically, even taking Qwest's allegations as true, Qwest has not pleaded facts from which the court could infer that McLeodUSA is in the business or profession of supplying information, as required for Qwest to assert its negligent misrepresentation counterclaims, nor has Qwest alleged that any statute or regulation, either expressly or implicitly, provides for a private cause of action, as required for Qwest to assert its negligence counterclaims.

THEREFORE,

1.      McLeodUSA's July 24, 2006, Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted (docket no. 29), which pertains to Qwest's original Counterclaims (docket no. 21), filed May 19, 2006, is **denied as moot**.

2.      McLeodUSA's September 11, 2006, Amended Motion To Dismiss For Failure To State A Claim Upon Which Relief May Be Granted (docket no. 44) is **granted in part and denied in part**, as follows:

a.      The motion is **granted** as to Counts VI, XIX, and XXIX of Qwest's Counterclaims,   which   purport   to   state   counterclaims   for   negligent

misrepresentation, and **granted** as to Counts XXII and XXX of Qwest's Counterclaims, which purport to state counterclaims for negligence, but

      b.     The motion is **denied** as to Counts VII, XXV, and XXXIII of Qwest's Counterclaims, which state counterclaims for conversion; **denied** as to Counts VIII, XXVI, and XXXIV, which state counterclaims for trespass; **denied** as to Count XVII, which states a counterclaim for fraud; and **denied** as to Counts XVIII and XXVIII, which state counterclaims for fraudulent concealment.

**IT IS SO ORDERED.**

**DATED** this 16th day of January, 2007.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA